Frederic W. Gray v. Commissioner. Lila Pearl Gray v. Commissioner.
Frederic W. Gray v. Commissioner
Docket Nos. 14300, 14301.
United States Tax Court
1949 Tax Ct. Memo LEXIS 116; 8 T.C.M. (CCH) 710; T.C.M. (RIA) 49193; August 10, 1949
*116 Charles J. Munz, Jr., Esq., for the petitioners. Earl C. Crouter, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These proceedings, consolidated for hearing, involve deficiencies in income and victory taxes for 1943 and income taxes for 1944, as follows: 1943
1944
Frederic W. Gray
$15,143.80
$4,817.33
Lila Pearl Gray
15,101.88
4,797.32 The questions in issue are whether the petitioners are entitled to deduct in 1943 and 1944 (1) payments made to a bank on a note which Frederic W. Gray had guaranteed in a prior year, and (2) the disallowed portions of additions to a bad debt reserve in 1943 and 1944. The petitioners, being husband and wife and having filed returns on a community property basis in the State of California, each claim one-half of the total allowable deductions for both of the years involved. Findings of Fact The petitioners are husband and wife and at all times here material were residents of the State of California. They filed separate federal income tax returns for the taxable years involved with the collector for the 6th district of California. The returns were community property returns *117 made for a calendar year and on a cash receipts and disbursments basis. The income reported in the returns consisted entirely of the husband's earnings. Frederic W. Gray, hereinafter referred to as the petitioner, for a number of years has been engaged in the business of financing purchases of used automobiles, both by dealers and individuals. Prior to 1933 he was in partnership with his uncle, F. T. Woodman, doing business under the trade name of Woodman-Gray Company. In 1931 a corporation, Citizens Auto Finance Corporation, was organized to take over the business. The petitioner and Woodman each received one-half of the 2,500 shares of issued stock. Citizens Auto Finance Corporation, hereinafter sometimes referred to as the corporation, began operations about June 28, 1933. It acquired from the partnership at that time assets of a net value of about $100,000, consisting principally of automobile purchase contracts which the partnership had acquired from various dealers and automobile loan brokers. The corporation had about $51,000 or $52,000 cash. It operated until about May 21, 1934, when due to financial troubles resulting from embezzlement by one or more of its office employees, *118 it ceased doing business. Its creditors agreed not to force their claims and there were no bankruptcy proceedings. The liquidation of the corporation extended over a period of about two years. In the meantime, the petitioner continued the business in an individual capacity. On June 30, 1933, the corporation obtained a new loan from the bank of $48,185.59, which was used to pay off the indebtedness of the Woodman-Gray Company partnership to the bank. On September 26, 1933, the corporation gave the bank its note, No. 30578, in the amount of $47,500. This note was signed by F. T. Woodman and the petitioner on behalf of the corporation and was guaranteed in writing on the back by F. T. Woodman and his wife. The amount of this note was posted in the bank ledger, making the balance due on the corporation's account at that time $65,909.91. On November 21, 1933, the corporation's note for $47,500, No. 30578, was renewed by note, No. 30864, for the same amount. That amount was then credited to the corporation's account, leaving a balance due on that account at November 21, 1933, of $14,104.06. That balance was thereafter reduced by small payments until finally paid off on September 19, 1934. *119 The renewal note, No. 30864, was signed by F. T. Woodman and petitioner on behalf of Woodman-Gray Company. It was guaranteed in writing on the back by F. T. Woodman and his wife and the petitioner. There were several subsequent payments on the $47,500 note and also several renewal notes executed for the balance due on it. After dissolution of the corporation in 1934, the petitioner started in business again for himself in office space furnished by a business acquaintance for a share of his profits. It was several years before the petitioner was able to make any payment to the bank on the balance due on the old note. On December 1, 1943, the bank wrote thepetitioner as follows: "Dear Mr. Gray: In reviewing your note dated November 22, 1943 in the amount of $22,800 we find that although the note is sufficiently secured, it has been in the bank quite a long time without a substantial reduction; therefore we will appreciate it if you will give consideration to making a payment of at least $10,000 on this note as soon as possible." * * *
The note referred to in the above letter was a renewal note for the balance due on the $47,500 note, No. 30864, referred to above. In response *120 to the bank's letter the petitioner made a payment to the bank of $10,000 on December 23, 1943. He made additional payments of $6,800 on October 3, 1944, and $6,048 on December 13, 1944. The petitioner's co-endorser or guarantor, F. T. Woodman, had previously paid more than one-half, his portion, of the original note. In 1942 the petitioner obtained permission from the Commissioner to use the reserve method for bad debts instead of the method previously used of charging off specific bad debts. The used automobile business at that time was in a disturbed condition due to war activities and restrictions. A great many automobile finance companies, and especially those in California, went out of business during the years 1941, 1942 and 1943. Petitioner was informed that others engaged in the automobile finance business usually maintained bad debt reserves of from 5 to 10 per cent of the total business on their books. After consultation with his auditor, the petitioner set up bad debt reserves for 1942 equivalent to 7 1/2 per cent of accounts receivable and 6 per cent of the loans and mortgages on the books at that time. For 1943 and 1944 these percentages were raised to 11 per cent *121 as to contracts and 8 per cent as to loans and mortgages. Specific bad debts were charged to the reserve each year. For each of the years 1942, 1943 and 1944, the bad debt reserve at the beginning of the year, the additions thereto, the charges made to the reserve and the balance of the reserve at the close of the year were as follows: 1942
1943
1944
1. Reserve at beginning of year
$26,296.20
$59,809.18
2. Additions during year
$42,496.35
45,605.92
15,309.73
3. Charges made during year
16,200.15
12,092.94
14,126.35
4. Balance at close of year
26,296.20
59,809.18
60,992.56
In determining the actual bad debts each year the petitioner included certain items, such as cost of repossession, interest, etc., that were not properly taken into the bad debt account. The actual bad debts, as adjusted by a revenue agent and the petitioner's accountant, the amounts claimed as additions to the reserve, and the amounts allowed by the respondent for 1942, 1943 and 1944, were as follows: 1942
1943
1944
1. Actual bad debts, as adjusted
$ 9,391.17
$ 2,816.58
$ 3,067.45
2. Claimed as additions to reserve
35,687.37
37,270.47
4,250.83
3. Allowed by respondent
16,641.19
7,508.29
3,566.58
*122 Opinion LEMIRE, Judge: The petitioner contends that the amounts which he paid to the bank in 1943 and 1944 in settlement of his obligations as co-guarantor of the note on which the payments were made are deductible as business losses for those years. The facts, briefly summarized, are as follows: The petitioner and his uncle, F. T. Woodman, conducted an automobile financing business as equal partners until about June 30, 1933, when the business was incorporated. The corporation took over the assets of the partnership of a value of about $100,000. The partnership owed the bank about $46,000 on open account. The corporation gave the bank its note for $48,185.59, the proceeds of which were used, for the most part, to pay off the partnership's indebtedness to the bank. Thereafter, the corporation operated until about the end of May 1934, when it went out of business on account of the embezzlement of its funds by one or more of its employees. Presumably it became insolvent, although evidence is lacking as to the exact condition of its finances, except that its note for $47,500 then held by the bank was not paid and was renewed by the petitioner and Woodman. There was no immediate *123 liquidation of the business, however. Petitioner apparently took over what remained of the going concern and operated it as sole proprietor. Finally in 1943 and 1944 the petitioner paid off the balance due on the note, or on the renewal note which was substituted for it. It is those payments which he now seeks to deduct. In opposing the deductions the respondent argues that the petitioners have failed to prove that they sustained any loss in respect of the payments in question in either of the years involved. While the evidence makes it difficult to trace the note which the petitioner paid in 1943 and 1944, we are satisfied that the obligation which he paid had its origin in the Citizens Auto Finance Corporation note issued to the bank on September 26, 1933. The petitioner did not endorse this note individually but he did give the bank his personal guaranty of the account on which the note was entered and was personally liable for its payment. Although this note was renewed from time to time and was reduced in amount, it was not paid off in full until the payments in dispute were made by the petitioner in 1943 and 1944. There is no question but that the obligation was of a business *124 nature. The actual loss of the money represented by the note may have occurred, and apparently did, some years before the petitioner paid off the balance due on the note, as the respondent argues, but even so the petitioner, reporting on a cash basis, could not have taken his deduction until he had actually paid the loss. See ; . At the hearing counsel for the respondent raised a question as to whether petitioner's individual returns for the taxable years were not made on an accrual basis; and whether, if so the losses claimed were not deductible in some prior year. We are satisfied from an examination of the returns that they were made on a cash basis, and have so found above. The evidence as to the bad debt reserves affords no basis for setting aside the respondent's determination. The additions to the bad debt reserve in 1943 were greatly in excess of the actual bad debt losses for that year. For instance, there was a reserve at the beginning of the year of $26,296.20 and additions thereto during the year of $45,605.92, while chargeable against the reserve, representing actual bad debts, *125 were $12,092.94, as shown by the books, and only $2,816.58, as adjusted. The respondent allowed additions to the reserve of $7,508.29. In 1944 there were additions to the reserve of $15,309.73, charges against the reserve of $14,126.35, actual bad debts, as adjusted, of only $3,067.45 and $3,566.58 allowed as additions to the reserve by the respondent. The large additions to the bad debt reserve claimed by the petitioners were obviously in excess of the actualneeds in each of the taxable years. There is no evidence before us on which we can find that the amounts allowed by the respondent were not reasonable additions to the bad debt reserve in those years. No question is raised by the respondent as to the propriety, or permissibility, of petitioner's use of the bad debt reserves in computing income of the automobile financing business, while, as we have determined, the petitioner's individual returns were filed on a cash basis. See John I. Chipley, 25 bta/ 1103; . In any event, as stated above, the evidence contains no basis for setting aside the respondent's adjustment of the bad debt deductions claimed. Decisions will be entered under *126 Rule 50.